IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

JONATHAN DAVID SHEPARD,  §
individually as representative of the  §
ESTATE OF LACY DAWN CUCCARO,  §
and as Next Friend for A.L.S. and N.L.S.,  §
Minor Children,  §
  §                              NO. 2:14-CV-00147-J
    Plaintiffs,  §
  §
v.  §
  §
HANSFORD COUNTY and BRENDA  §
VERA, individually,  §
  §
    Defendants.  §

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendants' *Motion for Summary Judgment*, filed on March 9, 2015.

In that Motion, Defendants Brenda Vera ("Vera") and Hansford County ("the County") request

that the Court grant summary judgment in their favor on all of Plaintiffs' 42 U.S.C. § 1983

claims. Plaintiffs filed a response on April 16, 2015, arguing that genuine issues of material fact

exist as to both Vera's entitlement to the defense of qualified immunity and the County's liability

for alleged Fourteenth Amendment violations. Defendants filed a reply on May 14, 2015.

Defendants' Motion is GRANTED IN PART and DENIED IN PART.

### BACKGROUND

This case arises out of the suicide of a pretrial detainee housed in the Hansford County

jail. Lacy Dawn Cuccaro ("Lacy") was a twenty-eight-year-old resident of Gruver, Texas with a

history of psychological problems and suicidal behavior. On July 16, 2012, Lacy was arrested

for assault and was brought to the Hansford County Jail, located in Spearman, Texas. Three

days later, Lacy committed suicide by hanging herself from a shower curtain rod using a towel that was given to her by jail officials. Jonathan David Shepard—Lacy's husband and the representative of the Estate of Lacy Dawn Cuccaro—filed a lawsuit in this Court on June 23, 2014 on behalf of himself and his two minor children, alleging that Brenda Vera and Hansford County violated Lacy's right, under the Due Process Clause of the Fourteenth Amendment, to adequate protection from her known suicidal tendencies.

Lacy was brought to the Hansford County jail at 1:43 PM on July 16, 2012. Brenda Vera was the jailer on duty. In addition to her jailer duties, Vera was also a telecommunications supervisor for Hansford County. These two jobs imposed numerous responsibilities on Vera, including booking inmates into the jail, maintaining inmate observation logs and schedules, administering medication to inmates, preparing meals for inmates, arranging for visitation with inmates, handling inmate mail, delivering commissary items to inmates, providing clothing, shoes, and hygiene products to inmates, scheduling medical appointments for inmates, answering 911 calls, and dispatching radio calls for two local police departments, three local fire departments, Emergency Medical Services, and the Texas Department of Public Safety.

As part of the standard booking process, Vera asked Lacy several questions about her mental health and suicidal tendencies. Lacy answered "Yes" when asked if she had ever attempted suicide in the past, and informed Vera that she had tried to commit suicide in January of 2011. Lacy also answered "Yes" when asked if she had thoughts of killing herself in the past year. However, Lacy answered "No" when asked if she currently felt depressed and also answered "No" when asked if she was thinking about killing herself that day. Based on these responses, Vera indicated on the screening form for suicide and medical and mental impairments

that Lacy was at risk due to a mental illness or medical condition.  However, Vera did not state that Lacy was a suicide risk.

Nevertheless, jail administrator Debbie Hornsby placed Lacy on suicide watch at 4:00 PM on July 16, 2012 and moved Lacy to a cell by herself, where she could be observed via video camera.  There was a blanket and a towel in the cell, as well as a frosted shower curtain.  Because Lacy had been placed on suicide watch, Vera understood that she was required to comply with Hansford County's suicide watch policy.  Although the County's written policy established different observation frequencies for different degrees of suicide risk, it was apparently the County's unwritten policy that all inmates on suicide watch be observed face-to-face every fifteen minutes.  Each observation was to be recorded in an "Inmate Observation Suicidal Log."  Jailers at the Hansford County jail were able to remotely observe inmates in Lacy's cell through a video monitor, because there were two cameras trained on the cell.  However, Vera stated that it was her understanding that Hansford County policy required observations of inmates on suicide watch to be made face-to-face—observations solely via the video monitors were not sufficient.[1]

Vera reported for duty on the morning of Thursday, July 19, 2012 at 8:00 AM.  On a typical Thursday morning, there were two jail employees on duty.  However, on this particular morning, Vera was the only jailer on duty.  One jailer was out sick, another was absent due to a death in the family, and a third jailer was not scheduled to report to duty until 4:00 PM.  Hansford County Sheriff Gary Evans was also on duty on the morning of July 19, 2012.  However, he was apparently not present in the jail that morning.

---

[1] Vera's precise understanding of the suicide watch policy is unclear.  In her deposition, given on January 27, 2015, Vera states that to comply with the County's policy regarding suicide watch, the suicidal inmate must be observed every fifteen minutes "[e]ither face-to-face or on the monitor."  However, in a sworn declaration from March 6, 2015, Vera states that "I understood that I was not following Jail policy when I made my observations via the monitor."

Consistent with Hansford County's suicide watch policy, Vera made face-to-face observations of Lacy at 8:00 AM, 8:15 AM, and 8:30 AM and recorded those observations in the suicide log. Vera observed that Lacy was sleeping in her bed. However, as the morning progressed, Vera soon became busy with her other duties. As a result, her observations at 8:45 AM, 9:00 AM, and 9:15 AM were all made via the video monitor rather than face-to-face. Vera was aware that these observations were not in compliance with County policy. Vera's 9:30 AM observation was face-to-face. However, the observations at 9:45 AM, 10:00 AM, 10:15 AM, and 10:30 AM were once again made solely through the video monitor. At the 10:30 AM observation, Vera noted that Lacy had finally awoken. At 10:35 AM, Lacy called Vera via the jail's intercom system. Vera asserted that Lacy appeared calm and upbeat, and displayed no obvious suicidal tendencies during this brief interaction.

After the 10:30 AM observation, Vera states that she failed to record any further fifteen-minute observations because she was busy with other duties and was the only jailer on staff who could handle those duties. However, this statement is contradicted by Vera's later statement that while performing general inmate observations, she observed Lacy standing in her cell at 10:50 AM and recorded this observation in the suicide log as the 10:45 AM observation. The suicide log does indeed reflect this 10:45 AM observation. It is the last observation recorded in the suicide log. Vera states that she did not make the 11:00 AM observation because she was filling out arrest forms and answering phone calls. At 11:25 AM, Vera began the process of preparing lunch for the inmates. Preparing lunch required Vera to leave the area where the video monitors were located. Because Vera was the only jail employee on duty that morning, there was no one else to observe the video monitors while she prepared lunch. Consequently, Vera did not observe Lacy's conduct in the cell for a period of about twenty-three minutes. At 11:48 AM,

4

Vera again performed general inmate observations.  During these observations, Vera saw Lacy via the video monitor and recorded this observation on the inmate observation log, but *not* on the suicide log.  From 11:48 AM to 12:07 PM, Vera continued to prepare lunches and deliver them to the inmates; again preventing her from viewing Lacy's conduct either in person or in the video monitor.  At 12:07 PM, Vera brought a lunch tray to Lacy's cell.  Vera did not see Lacy in the cell, but saw what appeared to be the top of Lacy's head above the shower curtain.  Vera called out to Lacy, but, after receiving no response, Vera concluded that Lacy had hung herself in the shower.

Hansford County policy prohibits a jailer from entering a cell alone, for any reason.  If a jailer found herself in a situation where she needed to enter a cell, County policy required that the jailer call another jail employee so that both could enter the cell together.  Sheriff Gary Evans explained that the purpose of this unwritten policy was to prevent a possible escape or assault on a jailer by an inmate who was feigning a suicide attempt.

Vera complied with this cell-entry policy and did not enter the cell to cut Lacy down, to check to see if she was still alive, or to attempt to resuscitate her.  Vera also failed to call EMS, stating that she believed Lacy was already dead.  Instead, Lacy called Sheriff Evans, who was eating lunch five blocks from the jail.  Sheriff Evans arrived no more than two or three minutes after receiving the call and entered the cell while Vera stood by the door.  Sheriff Evans found that Lacy had no pulse and was cool to the touch.  He did not cut her body down from the shower curtain rod but instead left the cell to notify the Texas Rangers and the Hansford County Justice of Peace.  Lacy's suicide was the first suicide at the Hansford County jail that either Vera or Sheriff Evans could recall.  However, Vera stated that Hansford County placed a detainee on suicide watch roughly once every month.

Vera stated that she never saw or heard anything from Lacy on July 19, 2012 that would indicate a substantial risk that Lacy would commit suicide. Video from the jail shows that for a period of roughly ten to fifteen minutes prior to her suicide, Lacy was performing actions strongly suggestive of suicidal intent, including wrapping a towel around her neck, measuring the towel against the bars of the cell, and walking in and out of the shower stall. Had Vera been observing the video monitors at that time, she would have seen Lacy's suicidal actions. The time stamp on the video indicates that this conduct—including Lacy's actual suicide—occurred sometime between 10:30 AM and 11:00 AM. However, the time stamp on the video is inconsistent with Vera's sworn declaration and deposition testimony in which she states that she observed Lacy alive in her cell at 11:04 AM and 11:48 AM and did not find her hanging in the shower stall until 12:07 PM. Vera states that if she had observed Lacy's suicidal behavior in the video monitor, she would have immediately stopped what she was doing and would have called Sheriff Evans so they could enter the cell and intervene.

Despite the fact that Vera was the only jailer on duty on the morning of July 19, 2012 and despite the fact that she knew it was impossible for her to perform all her duties while simultaneously maintaining the strict fifteen-minute face-to-face observations required by County policy, Vera never made any effort to obtain additional assistance. She did not call any jail employees to see if they could help her that morning. She did not inform Sheriff Evans that she needed assistance or that it would be impossible for her to maintain the required suicide checks. And she did not postpone her other duties in order to ensure that the fifteen-minute face-to-face observations were maintained.

Likewise, Sheriff Evans did not make any effort to obtain additional assistance for Vera, despite the fact that he knew she was the only jailer on duty that morning and was concerned

6

about her ability to properly conduct the required suicide checks. Before leaving for lunch, Sheriff Evans did not ask Vera if she needed any help and he did not ask Vera if she was able to maintain the fifteen-minute face-to-face observations. Sheriff Evans further stated that these types of staffing problems had occasionally occurred in the past. However, Vera asserted that this was the first time she had been unable to complete all the required suicide checks.

Brenda Vera had ten years of experience as a jailer and had received training prior to July 2012 on suicide issues in jails. Vera had also interacted with Lacy prior to her July 2012 arrest. Lacy was arrested in April of 2012 and was also placed on suicide watch at that time. However Vera stated that Lacy never talked about her mental state and did not express a desire to kill herself during her brief April detention.

Lacy Cuccaro's husband, Jonathan David Shepard, filed suit in this Court on June 23, 2014 on behalf of himself and his minor children. In his original complaint, Plaintiffs asserted claims under 42 U.S.C. § 1983 against Brenda Vera in her individual capacity, Sheriff Gary Evans in his official capacity, and Hansford County for alleged Fourth Amendment violations. However, because the facts alleged in the complaint were consistent with a Fourteenth Amendment violation, rather than a Fourth Amendment violation, this Court construed Plaintiffs' complaint to state a cause of action under section 1983 for violations of Lacy Cuccaro's Fourteenth Amendment right to adequate protection from known suicidal tendencies.[2] On September 19, 2014, the Court granted Plaintiffs' unopposed motion to dismiss all claims against Sheriff Gary Evans. The remaining Defendants filed a *Motion for Summary Judgment* on March 9, 2015 and Plaintiffs filed a response on April 16, 2015, arguing that genuine issues of

---

[2] Defendants argue that they are entitled to summary judgment on any Fourth Amendment claims raised by Plaintiffs. However, because the Court has already construed Plaintiffs' Fourth Amendment claims as Fourteenth Amendment claims, this formality is unnecessary.

material fact precluded summary judgment as to Brenda Vera's qualified immunity defense and Hansford County's liability for alleged Fourteenth Amendment violations.

## STANDARD FOR SUMMARY JUDGMENT MOTIONS

This Court may grant summary judgment on a claim if the record shows that there is no genuine issue of material fact and that "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party on the issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Where the nonmovant bears the burden of proof at trial, the movant may either offer evidence that undermines one or more of the essential elements of the nonmovant's claim, or point out the absence of evidence supporting an essential element of the nonmovant's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (where there is an absence of evidence supporting an essential element of the nonmovant's claim, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial").

If the movant successfully carries this burden at the summary judgment stage, the burden then shifts to the nonmovant to show that the court should not grant summary judgment. *Id.* at 324.  The nonmovant must set forth specific facts that show a genuine issue for trial—only a genuine dispute over a material fact will preclude summary judgment. *Anderson*, 477 U.S. at 248, 256.  The nonmovant cannot rely on conclusory allegations, improbable inferences, or unsupported speculation. *Krim v. BancTexas Grp., Inc.*, 989 F.2d 1435, 1449 (5th Cir. 1993).  In ruling on a summary judgment motion, a court must review the facts and draw all reasonable inferences in favor of the nonmoving party—here, the Plaintiffs. *See Reid v. State Farm Mut. Auto. Ins. Co.*, 784 F.2d 577, 578 (5th Cir. 1986).

## DISCUSSION

"Section 1983 provides a federal cause of action for the deprivation, under color of law, of a citizen's rights, privileges, or immunities secured by the Constitution and laws of the United States." *Livadas v. Bradshaw*, 512 U.S. 107, 132 (1994) (internal quotation marks omitted). To state a claim under § 1983, a plaintiff must allege facts that show that he has been deprived of a right secured by the Constitution and the laws of the United States and that the deprivation occurred under color of state law. *See Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155-56 (1978); *Cornish v. Corr. Servs. Corp.*, 402 F.3d 545, 549 (5th Cir. 2005). Here, Plaintiffs allege that Brenda Vera and Hansford County violated Lacy Cuccaro's rights under the Due Process Clause of the Fourteenth Amendment by failing to provide Lacy with adequate protection from her known suicidal tendencies while she was a pretrial detainee at the Hansford County jail. Defendants seek summary judgment on the grounds that (A) Brenda Vera is entitled to the defense of qualified immunity; and (B) Hansford County is not liable for the alleged Fourteenth Amendment violations.

### A.   QUALIFIED IMMUNITY

Qualified immunity is a doctrine designed to protect government officials sued in their individual capacity from liability for civil damages, so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). If a defendant successfully establishes the qualified immunity defense, he or she is completely immune from suit. *See id.* At the summary judgment stage, once the government official pleads the defense of qualified immunity, the burden shifts to the plaintiff to

rebut the defense by establishing that the official's conduct violated clearly established law. *See*

*Thompson v. Upshur Cnty., Tex.*, 245 F.3d 447, 456 (5th Cir. 2001).

Because Defendant Brenda Vera properly pled the defense of qualified immunity in her

*Motion for Summary Judgment*, the burden shifts to the Plaintiffs to establish that Vera is not

entitled to qualified immunity. *See Jones v. Throckmorton Cnty., Tex.*, 1:02-CV-182-C, 2004

WL 419811, at *3 (N.D. Tex. March 8, 2004). To survive summary judgment on the issue of

qualified immunity, Plaintiffs must satisfy two independent inquiries. First, the Court asks

whether, viewing the summary judgment evidence in the light most favorable to Plaintiffs, the

Defendants violated Lacy Cuccaro's constitutional rights. *See Freeman v. Gore*, 483 F.3d 404,

410 (5th Cir. 2007). If the Court determines "that the alleged conduct did not violate a

constitutional right, [the] inquiry ceases because there is no constitutional violation for which the

government official would need qualified immunity." *Lytle v. Bexar Cnty., Tex.*, 560 F.3d 404,

410 (5th Cir. 2009). If there is a genuine dispute of material fact regarding whether Brenda Vera

violated Lacy's constitutional rights, the Court then asks whether Vera's actions were objectively

unreasonable in light of the clearly established law at the time of the constitutional violation. *See*

*Freeman*, 483 F.3d at 411. If the Court answers both of these questions in the affirmative, the

government official is not entitled to qualified immunity. *Lytle*, 560 F.3d at 410.

Since the Supreme Court's decision in *Pearson v. Callahan*, federal district courts are

permitted to exercise their sound discretion in determining the order in which to analyze the two-

part qualified immunity test. 555 U.S. 223, 236 (2009). Here, the Court will first address the

question of whether the summary judgment evidence could support a jury finding that Lacy's

constitutional rights were violated. If the Court answers that question in the affirmative, it will

then turn to the question of whether Brenda Vera's actions were nevertheless objectively reasonable in light of the law that was clearly established at the time of Lacy's suicide.

### 1.   The Existence of a Constitutional Violation

Plaintiffs have alleged that the episodic acts and omissions of Defendant Brenda Vera violated Lacy Cuccaro's Fourteenth Amendment Due Process rights as a pretrial detainee. Pretrial detainees have a constitutional right, under the Due Process Clause of the Fourteenth Amendment, to adequate medical care and protection from harm during the length of their confinement. *See Thompson v. Upshur Cnty., Tex.*, 245 F.3d 447, 457 (5th Cir. 2001); *Jacobs v. West Feliciana Sheriff's Dep't*, 228 F.3d 388, 393 (5th Cir. 2000). Because the suicide of a pretrial detainee implicates both the state's duty to provide medical care and its duty to provide protection from harm, *Jones v. Throckmorton Cnty., Tex.*, 1:02-CV-182-C, 2004 WL 419811, at *4 (N.D. Tex. March 8, 2004), failing to provide pretrial detainees with medical care and adequate protection from their known suicidal impulses is a violation of the Fourteenth Amendment, *Nunez v. Deviney*, 4:06-CV-0579-BE, 2007 WL 2059726, at *2 (N.D. Tex. July 17, 2007) (citing *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 639 (5th Cir. 1996)).

In *Hare*, the Fifth Circuit adopted the subjective deliberate indifference test to determine when the episodic acts or omissions of an individual county official violate a pretrial detainee's right to medical care and protection from harm under the Fourteenth Amendment.  74 F.3d at 647-48.  The Fifth Circuit borrowed this subjective deliberate indifference test from *Farmer v. Brennan*, 511 U.S. 825 (1994), a case in which the Supreme Court applied the test to determine whether prisoners were denied humane conditions of confinement in violation of the Eighth Amendment. *See Hare*, 74 F.3d at 648.  Thus, "the State owes the same duty under the Due Process Clause and the Eighth Amendment to provide both pretrial detainees and convicted

inmates with basic human needs, including medical care and protection from harm, during their confinement." *Id.* at 650.

To prove a violation of the Fourteenth Amendment under the subjective deliberate indifference test, a plaintiff must establish two elements: (1) that the defendant had subjective knowledge of a substantial and serious risk that the pretrial detainee might commit suicide; and (2) that the defendant nevertheless disregarded the risk of suicide by responding to it with deliberate indifference. *See id.* In other words, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference," yet still disregard the risk of suicide. *Jones v. Throckmorton Cnty., Tex.*, 1:02-CV-182-C, 2004 WL 419811, at *4 (N.D. Tex. March 8, 2004) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

**Subjective knowledge of a substantial suicide risk.** To prove that Brenda Vera had subjective knowledge of a substantial and serious risk that Lacy Cuccaro might commit suicide, Plaintiffs must establish that Vera had actual knowledge of the suicide risk. *See Hare v. City of Corinth, Miss.*, 74 F.3d 633, 650 (5th Cir. 1996). "An official's failure to alleviate a significant risk that he should have perceived but did not, while not commendable, does not rise to the level of deliberate indifference." *Nunez v. Deviney*, 4:06-CV-0579-BE, 2007 WL 2059726, at *2 (N.D. Tex. July 17, 2007) (citing *Farmer*, 511 U.S. at 838). However, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Herrin v. Treon*, 459 F. Supp. 2d 525, 538 (N.D. Tex. 2006).

Here, Plaintiffs' summary judgment evidence suggests that Vera had actual subjective knowledge of the substantial risk that Lacy might commit suicide. First, Lacy informed Vera that she had attempted suicide eighteen months earlier—in January of 2011. Second, Lacy also

informed Vera that she had thoughts of killing herself within the past year. Third, Lacy was placed on suicide watch by the jail administrator. Vera understood that this required her to perform face-to-face observations of Lacy every fifteen minutes in order to guard against the risk that Lacy might commit suicide. Fourth, Defendants admitted that Lacy's sister spoke with Vera on July 18, 2012 about Lacy's mental health issues and suicidal tendencies. Fifth, Vera knew that Lacy had been arrested three months earlier and had also been placed on suicide watch at that time.

Finally, there appears to be a factual dispute regarding the precise timing of Lacy's overtly suicidal behavior. Video evidence clearly shows that for a period of approximately ten to fifteen minutes, Lacy's behavior was strongly indicative of suicidal intent—she can be seen wrapping a towel around her neck, measuring the towel against the bars of the cell, and walking in and out of the shower. Vera claims that Lacy's suicidal behavior occurred sometime between 11:30 AM and 12:00 PM and that she did not observe this behavior on the video monitor because she was preparing lunch for the inmates. However, the time stamps on the video indicate that Lacy's suicidal behavior occurred sometime between 10:40 AM and 10:57 AM. And because Vera stated that she performed a visual check on Lacy via the video monitor at 10:50 AM, Plaintiffs appears to be arguing that Vera might have actually seen Lacy's overtly suicidal behavior.

It is true that previous suicide attempts that are remote in time are insufficient, standing alone, to establish a substantial risk of suicide. *See Calton v. Livingston*, No. H-09-2507, 2011 WL 2118700, at *13 (S.D. Tex. May 27, 2011) (finding that an inmate's suicide attempt three years earlier was too remote in time to establish a strong likelihood of suicide). However, the prior suicide attempt that Lacy revealed to Vera occurred just eighteen months before Lacy's

successful suicide.  Furthermore, Vera knew that Lacy had been placed on suicide watch in the same jail just three months earlier.  Vera also knew that Lacy had experienced suicidal thoughts within the past year and had been placed on suicide watch by the jail administrator just two days earlier.  Although some courts have found that the mere fact that a pretrial detainee was placed on suicide watch "does not demonstrate a subjective awareness of a substantial risk of imminent suicide," *Simmons v. Navajo Cnty.*, 609 F.3d 1011, 1018 (9th Cir. 2010) (emphasis omitted), other courts in the Fifth Circuit have found that a detainee's placement on suicide watch supports the conclusion that the defendant had actual knowledge of a suicide risk, *Nagle v. Gusman*, No. CIV.A. 12-1910, 2014 WL 6475327, at *13 (E.D. La. Nov. 18, 2014).  Plaintiffs have presented enough evidence to create a genuine dispute of material fact as to whether Vera had subjective knowledge of a substantial risk that Lacy would commit suicide.  There are disputed fact issues regarding the timing of Lacy's suicidal behavior and the obviousness of the suicide risk that should be resolved by a jury.

**Responding to a suicide risk with deliberate indifference.**  To prove that Vera responded to the risk of suicide with deliberate indifference, Plaintiffs must establish more than mere negligence or a lack of oversight.  *See Hare v. City of Corinth, Miss.*, 74 F.3d 633, 646 (5th Cir. 1996).  Instead, Plaintiffs must establish that Vera failed to take measures to prevent Lacy from committing suicide, despite Vera's knowledge of a substantial risk of suicide.  *See Nagle v. Gusman*, No. CIV.A. 12-1910, 2014 WL 6475327, at *12 (E.D. La. Nov. 18, 2014) (citing *Jacobs v. West Feliciana Sheriff's Dep't*, 228 F.3d 388, 394 (5th Cir. 2000)).  Although a defendant's conduct must be egregious, deliberate indifference does not require an actual intent to cause harm—"it is satisfied by something less than acts or omissions for the very purpose of

causing harm or with knowledge that harm will result." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994).

First, Plaintiffs presented evidence that Vera left Lacy in a cell with access to a towel, blanket, and shower curtain—dangerous objects that could easily be used by an inmate to commit suicide. *See Herrin v. Treon*, 459 F. Supp. 2d 525, 538 (N.D. Tex. 2006) (finding that defendants acted with deliberate indifference, in part because they failed to remove dangerous objects from the cell of a suicidal inmate). Second, Plaintiffs presented evidence that Vera intentionally abandoned her observation post on multiple occasions, failed to maintain the required fifteen-minute face-to-face observations, and made no efforts to ensure that the suicide watch was maintained in her absence. *See Nagle v. Gusman*, No. CIV.A. 12-1910, 2014 WL 6475327, at *13 (E.D. La. Nov. 18, 2014) (finding that defendant acted with deliberate indifference when he left a suicidal pretrial detainee unobserved on at least three different occasions without taking any measures to protect the detainee from harm).

Defendants argue that this evidence shows that Vera was at most negligent in failing to comply with county policy. *See Calton v. Livingston*, No. H-09-2507, 2011 WL 2118700, at *12 (S.D. Tex. May 27, 2011) ("an officer's failure to follow prison rules, standing alone, does not warrant relief under 42 U.S.C. § 1983"). However, the policy violations in *Calton* are readily distinguishable from Vera's violation of the Hansford County jail's suicide watch policy. First, in *Calton*, one jail official failed to pat down a suicidal inmate before he entered the infirmary because she believed another jail official had already done so. *Id.* at *11. Second, the same jail official also failed to keep the inmate under direct observation while he was in the restroom, apparently because of a miscommunication with another staff member. *Id.* at *6. Because both

of these jail policy violations were isolated incidents more consistent with negligence than deliberate indifference, the court found that there was no constitutional violation. *Id.* at *14.

By contrast, Vera's violations of the fifteen-minute face-to-face suicide watch policy were pervasive and intentional. On multiple occasions, she consciously chose to prioritize her other jail duties over her suicide watch obligations—failing to perform face-to-face observations of Lacy at 8:45 AM, 9:00 AM, 9:15 AM, 9:45 AM, 10:00 AM, 10:15 AM, 10:30 AM, and 10:45 AM, and failing to perform any observations whatsoever at 11:00 AM, 11:15 AM, 11:30 AM, 11:45 AM, and 12:00 PM. Lacy never informed Sheriff Evans that she was unable to perform all the required duties by herself and she never sought help with maintaining the fifteen-minute suicide watch. The evidence suggests that Lacy did more than simply fail to follow prison rules—she acted with deliberate indifference by intentionally prioritizing her other duties over her suicide watch duties and by failing to take steps to protect Lacy from harm. *See Estate of Pollard v. Hood Cnty., Tex.*, 579 F. App'x 260, 265 (5th Cir. 2014) ("in some cases, failure to execute a plan to prevent against a detainee's suicide may amount to deliberate indifference").

Third, Plaintiffs presented evidence that after Vera discovered Lacy hanging, Vera did not enter the cell, did not cut Lacy down, did not attempt to resuscitate Lacy, and failed to call 911. Although these actions were consistent with Hansford County policy, some courts have found that this type of reaction to the discovery of a hanging inmate is suggestive of deliberate indifference—even if the reaction is consistent with the county's cell-entry policy. *See Herrin v. Treon*, 459 F. Supp. 2d 525, 531-32, 538 (N.D. Tex. 2006) (finding that defendants acted with deliberate indifference when they failed to quickly enter the cell where an inmate was hanging, despite a jail policy requiring supervisory approval to enter the cell); *Heflin v. Stewart Cnty., Tenn.*, 958 F.2d 709, 716-17 (6th Cir. 1992) (finding that defendants acted with deliberate

16

indifference when they "took no reasonable steps" to save the life of a detainee found hanging, despite a jail policy prohibiting officers from entering a cell alone if they discovered a suicide in progress).

Plaintiffs' summary judgment evidence creates genuine disputed issues of fact about whether Vera was deliberately indifferent to Lacy's need for protection from the risk of suicide. A reasonable jury could find that Vera violated Lacy's constitutional rights by responding with deliberate indifference to the substantial risk that Lacy might commit suicide.

## 2.   Objectively Unreasonable Conduct

Because the Plaintiffs' summary judgment evidence raises genuine disputes of material fact as to whether Vera violated Lacy's constitutional rights, the Court turns to the second prong of the qualified immunity test: whether Vera's actions or omissions were nonetheless objectively reasonable in light of the clearly established law at the time of Lacy's suicide. *See Freeman v. Gore*, 483 F.3d 404, 410-11 (5th Cir. 2007). At this stage of the qualified immunity analysis, the Court asks whether the law lacked such clarity that it would be objectively reasonable for an officer to erroneously believe that his conduct was not deliberately indifferent to the substantial risk of suicide. *See Lytle v. Bexar Cnty., Tex.*, 560 F.3d 404, 410 (5th Cir. 2009). This second step in the qualified immunity analysis is best understood as two distinct inquiries: (1) what was the clearly established law at the time of Lacy's suicide; and (2) were Vera's actions objectively unreasonable in light of that clearly established law? *See Hare v. City of Corinth, Miss.*, 135 F.3d 320, 326 (5th Cir. 1998). At the summary judgment stage, "a plaintiff must present evidence to raise a fact issue 'material to the resolution of the questions whether the defendants acted in an objectively reasonable manner in view of the existing law and facts available to

them.'" *Calton v. Livingston*, No. H-09-2507, 2011 WL 2118700, at *15 (S.D. Tex. May 27, 2011) (quoting *Lampkin v. City of Nacogdoches*, 7 F.3d 430, 435 (5th Cir. 1993)).

**The clearly established law.** Because the Court is required to apply the law that was clearly established at the time of the alleged violation, only cases from before July 19, 2012 will be relevant when evaluating the objective reasonableness of Vera's conduct. *See Thompson v. Upshur Cnty., Tex.*, 245 F.3d 447, 457 (5th Cir. 2001). To be clearly established, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Although prior cases involving materially similar facts provide strong support for a finding that the law is clearly established, an official can still be on notice that his conduct violates clearly established law even in novel factual circumstances, "so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Herrin v. Treon*, 459 F. Supp. 2d 525, 536 (N.D. Tex. 2006) (quoting *Johnson v. Johnson*, 385 F.3d 503, 525-26 (5th Cir. 2004) (internal quotation marks omitted)). Fifth Circuit and Supreme Court cases are the primary sources this Court should use to determine the clearly established law at the time of the constitutional violation; however, a court is also permitted to consider cases from other circuit courts. *See McClendon v. City of Columbia*, 305 F.3d 314, 328-29 (5th Cir. 2002).

It has been clearly established law in the Fifth Circuit, since at least 1989, that jail officials are liable for their episodic acts or omissions if they satisfy the subjective deliberate indifference test. *See Jacobs v. West Feliciana Sheriff's Dep't*, 228 F.3d 388, 393-94 (5th Cir. 2000). Specifically, "[t]he Fifth Circuit has observed that the law is clearly established that prison officials and jailers 'must take measures to prevent inmate suicides once they know of the suicide risk.'" *Calton v. Livingston*, No. H-09-2507, 2011 WL 2118700, at *16 (S.D. Tex. May

27, 2011) (quoting *Hare v. City of Corinth, Miss.*, 135 F.3d 320, 329 (5th Cir. 1998)). However, at least in 2000, the Fifth Circuit was unable to say that the law was established with any clarity as to what specific measures jail officials must take, once they know of a suicide risk. *See Jacobs*, 228 F.3d at 394-95. But, the *Jacobs* decision did produce some clearly established law in the Fifth Circuit as to what specific measures jail officials must take, and what actions jail officials must avoid, once they know of a suicide risk. First, the law was clearly established as of July 2012 that a jail official acts with deliberate indifference when he places a suicidal detainee in a cell with tie-off points and blankets, despite knowledge of a prior suicide in that same cell. *See id.* at 395-96. The law was also clearly established that a jail official acts with deliberate indifference where he knew of an earlier hanging in the same cell, and knew that the detainee was a suicide risk, yet failed to remove a blanket in the cell and failed to maintain regular suicide checks. *See id.* at 397-98. However, it was also clearly established law that carelessly failing to abide by an unwritten suicide check policy, standing alone, reflects mere negligence and not deliberate indifference. *See id.* at 398.

**The objective reasonableness of Vera's conduct.** Given the law that was clearly established as of July 19, 2012, the next inquiry is whether the conduct of Vera was objectively reasonable in light of that clearly established law. *See Hare v. City of Corinth, Miss.*, 135 F.3d 320, 327 (5th Cir. 1998). It is critical to distinguish this objective reasonableness inquiry from the underlying subjective deliberate indifference standard for a Fourteenth Amendment violation. *See Thompson v. Upshur Cnty., Tex.*, 245 F.3d 447, 459 (5th Cir. 2001). For the second prong of the qualified immunity test, "the subjective deliberate indifference standard serves only to demonstrate the clearly established law in effect at the time of the incident. . . . And under that standard . . . the actions of the individual defendants are examined to determine whether, as a

matter of law, they were objectively unreasonable." *Jacobs v. West Feliciana Sheriff's Dep't*, 228 F.3d 388, 394 (5th Cir. 2000) (quoting *Hare*, 135 F.3d at 328). Vera's actions will be considered objectively reasonable unless "*all* reasonable officials in the defendant's circumstances would have then known that the defendant's conduct violated the United States Constitution." *Thompson*, 245 F.3d at 457 (emphasis in original).

Based on the limited guidance provided by the Fifth Circuit (as of July 19, 2012) as to what measures jail officials must take once they know of a suicide risk, the Court cannot say that all reasonable officials in Vera's circumstance would have known that Vera's actions and omissions violated the Fourteenth Amendment. A hypothetical reasonable officer in Vera's position could reasonably believe that he was not acting with deliberate indifference to the risk that Lacy would commit suicide. *See Freeman v. Gore*, 483 F.3d 404, 415 (5th Cir. 2007).

In 2000, the Fifth Circuit emphasized that the objective reasonableness of a jail official's decision to provide towels and blankets to a suicidal detainee depended in part on whether the jailer was aware of prior suicides in the jail. *See Jacobs v. West Feliciana Sheriff's Dep't*, 228 F.3d 388, 395-96 (5th Cir. 2000) (finding that a sheriff's conduct was objectively unreasonable where he placed a suicidal detainee in a cell with a blanket and towel despite knowledge of a prior suicide in that same cell). Here, both Vera and Sheriff Evans stated that to their knowledge, no detainee had ever committed suicide at the Hansford County jail prior to July 19, 2012. Thus it was not necessarily objectively unreasonable, in light of clearly established law in the Fifth Circuit, for Vera to allow Lacy access to a towel and blanket.

Furthermore, no Fifth Circuit case law clearly stated that, in an understaffing situation similar to the one faced by Vera, a jailer must abandon some of her other duties in order to ensure that all of the suicide checks were properly carried out. *See Thompson v. Upshur Cnty.,*

20

*Tex.*, 245 F.3d 447, 461-62 (5th Cir. 2001) (finding that a jailer's actions were objectively reasonable where no case law clearly stated that a sheriff was required to impose medical care against the wishes of a suicidal detainee, or locate a surrogate decision-maker). Given the Fifth Circuit's assertion in 2000 that "we cannot say that the law is established with any clarity as to what [measures jailers must take to prevent inmate suicide]," *Jacobs v. West Feliciana Sheriff's Dep't*, 228 F.3d 388, 394-95 (5th Cir. 2000), and given the lack of Fifth Circuit cases since 2000 that specifically identify constitutionally-mandated suicide prevention measures, the Court is unable to say that all reasonable officers in Vera's circumstance would realize that Vera's actions violated the Constitution. Accordingly, although genuine issues of material fact exist about whether Vera violated Lacy's constitutional rights, Vera's conduct was not objectively unreasonable in light of the clearly established law at the time of Lacy's suicide. Defendant Brenda Vera is thus entitled to the defense of qualified immunity and is immunized from suit in her individual capacity.

## B.   MUNICIPAL LIABILITY

In addition to Brenda Vera, Plaintiffs also sue Hansford County, Texas for alleged violations of Lacy Cuccaro's Fourteenth Amendment rights. In 1978, the Supreme Court first held that municipalities and other local governmental bodies—like Hansford County—are "persons" under 42 U.S.C. § 1983 and can thus be sued by individuals for their constitutional violations. *See Monell v. Dep't of Social Servs. of the City of New York*, 436 U.S. 658, 689-90 (1978). However, a municipality cannot be held liable under § 1983 simply because it employs a tortfeasor. *Bd. of the Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 403 (1997). Instead, a plaintiff must prove that the county itself is liable because it adopted a policy or

custom that caused an employee to commit a constitutional violation. *See id.*; *City of St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988).

Specifically, to establish municipal liability under § 1983, the plaintiff must prove (1) the existence of a policymaker; (2) the existence of an official municipal policy; and (3) a violation of the plaintiff's constitutional rights whose moving force was the municipal policy or custom. *Duvall v. Dall. Cnty., Tex.*, 631 F.3d 203, 209 (5th Cir. 2011); *Piotrowski v. City of Hous.*, 237 F.3d 567, 578 (5th Cir. 2001). "The three attribution principles identified here—a policymaker, an official policy and the 'moving force' of the policy—are necessary to distinguish individual violations perpetrated by local government employees from those that can be fairly identified as actions of the government itself." *Piotrowski*, 237 F.3d at 578.

Section 1983 constitutional claims alleged by or on behalf of pretrial detainees fall into one of two categories: (1) claims arising from the episodic acts or omissions of individual county officials; or (2) claims arising from the general conditions of confinement in the jail or prison. *See Shepard v. Dall. Cnty.*, 591 F.3d 445, 452 (5th Cir. 2009). A case is properly categorized as an episodic act or omission case where the plaintiff faults specific jail officials for their actions or omissions and then points derivatively to a municipal policy or custom that caused those actions. *See id.*; *Olabisiomotosho v. City of Hous.*, 185 F.3d 521, 526 (5th Cir. 1999). By contrast, a case is more appropriately categorized as a conditions of confinement case where the plaintiff does not point to specific actions or omissions of county employees, but instead attempts to demonstrate a long-standing and pervasive pattern of deficiencies that affects a substantial number of detainees. *Edler v. Hockley Cnty. Comm'rs Court*, 589 F. App'x 664, 668 (5th Cir. 2014); *Brown v. Bolin*, 500 F. App'x 309, 312-13 (5th Cir. 2012).

Here, Plaintiffs argue that their claims can be properly categorized as both episodic act or omission claims *and* conditions of confinement claims. However, the claims in Plaintiffs' complaint are more consistent with episodic act or omission claims. Plaintiffs' allegations focus on the individual actions and omissions of two county employees—Brenda Vera and Sheriff Gary Evans—on July 19, 2012. Specifically, Plaintiffs allege that Vera failed to comply with the required suicide checks and that Sheriff Evans failed to take steps to ensure that Vera would be able to maintain regular suicide checks while simultaneously performing her other duties. Plaintiffs then argue that the actions and omissions of Vera and Evans were the result of Hansford County policies and customs. This is a classic episodic act or omission claim. *See, e.g.*, *Gibbs v. Grimmette*, 254 F.3d 545, 548 n.2 (5th Cir. 2001) (finding that plaintiff stated an episodic act or omission claim where he complained of the failure of individual medical personnel to test him for tuberculosis).

To prove that Lacy's constitutional rights were violated by the episodic acts or omissions of individual County officials, and to prove that Hansford County is liable for those constitutional violations, the Plaintiffs must establish that (1) a Hansford County official violated Lacy's constitutional rights by displaying subjective deliberate indifference to a risk of serious harm; and (2) the official's actions were the result of a county policy, practice, or custom. *See* *Olabisiomotosho v. City of Hous.*, 185 F.3d 521, 526 (5th Cir. 1999).

The Court has already found sufficient summary judgment evidence to create a genuine dispute of material fact as to the first prong of the episodic act or omissions test. *See supra*, sec. A.1 ("Plaintiffs' summary judgment evidence creates genuine disputed issues of fact about whether Vera was deliberately indifferent to Lacy's need for protection from the risk of suicide"). Thus, there is summary judgment evidence to support a finding that Vera's episodic

acts and omissions on July 19, 2012 violated Lacy's constitutional right to protection from known suicidal tendencies. The only remaining issue is whether Vera's actions and omissions were the result of a Hansford County policy, practice, or custom. *See Olabisiomotosho*, 185 F.3d at 526.

As the Supreme Court made clear in *Monell*, municipal liability under § 1983 will only arise where the plaintiff can identify a municipal policy or custom that caused the constitutional deprivation. *See Bd. of the Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 403 (1997) (citing *Monell v. Dep't of Social Servs. of the City of New York*, 436 U.S. 658, 694 (1978)). Courts have recognized two types of policies for § 1983 purposes: (1) "[a] policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority;" or (2) "[a] persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 309 (5th Cir. 2004) (quoting *Johnson v. Moore*, 958 F.2d 92, 94 (5th Cir. 1992)).

If the municipal policy is not unconstitutional on its face, then the plaintiff must establish that the policy or custom was adopted or maintained with objective deliberate indifference to the pretrial detainee's constitutional rights. *See Piotrowski v. City of Hous.*, 237 F.3d 567, 579 (5th Cir. 2001). A county acts with deliberate indifference where its policymakers promulgate or fail to promulgate a policy or custom, despite the known or obvious consequences that constitutional violations will result. *See id.* The plaintiff must also establish that there is a direct causal link between the municipal policy and the officer's constitutional violation by showing that the policy

24

was the moving force behind that violation. *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989); *Piotrowski*, 237 F.3d at 580. A municipal policy usually cannot be inferred from a single constitutional violation. *Piotrowski*, 237 F.3d at 581.

In their response to Defendants' *Motion for Summary Judgment*, Plaintiffs identify two county policies[3] that they allege were the moving force behind Vera's violation of Lacy's Fourteenth Amendment rights: (1) a policy of deliberate indifference in training and supervising jail officials; and (2) a policy of understaffing and indifference to inmate supervision.

**Failure to train.** An inadequate training program or a failure to train "may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of the persons with whom the [county officials] come into contact." *Harris*, 489 U.S. at 388. Specifically, to hold a municipality liable under § 1983 based on a policy of inadequate training, a plaintiff must establish that (1) the training procedures of the municipality's policymaker were inadequate; (2) the municipality's policymaker was deliberately indifferent in adopting the training policy; and (3) the inadequate training policy directly caused the plaintiff's injury. *See Huong v. City of Port Arthur*, 961 F. Supp. 1003, 1007 (E.D. Tex. 1997) (citing *Baker v. Putnal*, 75 F.3d 190, 200 (5th Cir. 1996)).

The deliberate indifference standard in the context of inadequate training is a difficult standard to satisfy. Plaintiffs must show that "the need for more or different training is so obvious, and the inadequacy so likely to result in violations of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need." *Benavides v. Cnty. of Wilson*, 955 F.2d 968, 972 (5th Cir. 1992) (quoting *City of Canton, Ohio v.*

---

[3] As mentioned earlier, to establish municipal liability under § 1983, a plaintiff must prove the existence of a policymaker. *See Piotrowski v. City of Hous.*, 237 F.3d 567, 578 (5th Cir. 2011). It is undisputed that Sheriff Gary Evans is a final policymaker for § 1983 purposes. *See Bennett v. Pippin*, 74 F.3d 578, 586 (5th Cir. 1996) (noting that the Fifth Circuit has long recognized that a Texas county sheriff is the county's final policymaker in the area of law enforcement).

*Harris*, 489 U.S. 378, 390 (1989)).  The mere fact that an injury could have been avoided if an officer had better training is insufficient to show a constitutional violation.  *See Harris*, 489 U.S. at 391.  A county is only required to provide its officers with the minimum training necessary to detect the obvious medical needs of detainees with known and serious mental disorders.  *See Evans v. City of Marlin, Tex.*, 986 F.2d 104, 107 (5th Cir. 1993).  Training that would unerringly detect a detainee's latent suicidal tendencies is not required.  *See id.* at 107-08.

   Here, Plaintiffs argue that Hansford County failed to train Brenda Vera on the observation and detection of persons with suicidal tendencies, and also failed to train Vera on proper inmate supervision.  However, the summary judgment evidence cited by Plaintiff does not establish that Hansford County failed to train Vera or that the County's training policies were inadequate.  To the contrary, the evidence establishes that the County had training procedures in place for educating jailers about inmate suicide, and that Vera benefited from that training. First, there is evidence that Vera took courses in suicide prevention and detection prior to July 19, 2012.  Vera stated in her deposition that she became certified as a jailer in 2003 and received a certificate in 2004 for taking a class on jail suicides.  According to Vera, the purpose of the class was to teach jailers how to identify inmates who present a genuine suicide threat in order to determine which inmates should be placed on suicide watch.  Vera also received in-house training on jail classifications, which involved learning how to classify inmates as violent or suicidal and learning how to properly house those inmates depending on their classification. Sheriff Evans testified that jail employees were required to read the County's policy regarding face-to-face suicide checks.

   Second, there is evidence that Hansford County had training policies designed to educate its jailers about inmate mental health and suicide prevention.  For example, the General Manual

of the Hansford County Sheriff's Office includes information about training programs for mental health care.  And the Hansford County Detention Center Mental Disabilities/Suicide Prevention Plan outlines the procedures and policies for training jailers on the "recognition, supervision, documentation, and handling of inmates who are mentally disabled and/or potentially suicidal." There is no evidence that these training policies were inadequate and there is no evidence that Sheriff Evans acted with deliberate indifference in adopting or maintaining these training policies.  *See, e.g., Benavides v. Cnty. of Wilson*, 955 F.2d 968, 973-74 (5th Cir. 1992). Plaintiffs' assertion that "Defendant has produced no evidence whatsoever that it took the appropriate steps to ensure that Defendant Vera was adequately trained in the area of inmate supervision or suicide detection" is simply not true.

Plaintiffs argue that Hansford County's restrictive cell-entry policy—which required the presence of two jail staffers before a cell could be opened—is evidence that Vera was trained by Sheriff Evans to be deliberately indifferent to an inmate's needs whenever she was left alone in the jail.  However, there is no evidence that this training policy was adopted with deliberate indifference.  Sheriff Evans testified that the purpose of the restrictive cell entry policy was to protect jail staff and reduce the likelihood that a jailer would be assaulted or that an inmate would try to escape by feigning suicide.  Although it is true that no inmate in the Hansford County jail ever attempted to escape in this manner, there is no evidence that this training policy was so obviously inadequate and would so likely result in constitutional violations that the County was deliberately indifferent in maintaining the policy.  Hansford County had never experienced a suicide at its jail before July 19, 2012 and had no reason to believe that the cell-entry policy would lead to constitutional violations.

There is also no evidence that this training policy was the moving force behind Lacy's death.  The summary judgment evidence indicates that Vera observed Lacy alive at around 11:48 AM and then observed Lacy hanging in her shower stall at 12:07 PM.  Even if the cell entry policy did not exist and Vera had immediately entered the cell, cut Lacy down, and called 911, Lacy would still have been hanging unnoticed in the shower stall for up to 18 minutes.  There is simply no evidence that the County's cell-entry policy caused Lacy's death.

**Understaffing and indifference to inmate supervision.**  Plaintiffs next argue that Hansford County has a policy of indifference to inmate supervision because it routinely understaffed the County jail, making it impossible for jailers to maintain fifteen-minute suicide checks along with their other duties.  Plaintiffs presented evidence that Vera was the only jailer on duty on the morning of July 19, 2012.  One jailer was sick, another had taken the day off because of a death in the family, and a third was not scheduled to report for duty until later in the afternoon.  Vera was left alone to perform dozens of responsibilities, including administering medication, handling inmate mail, scheduling medical appointments, receiving 911 calls, dispatching radio calls, maintaining schedules and logs, and preparing inmate meals.  Because of these numerous responsibilities, and the absence of other jailers, Vera failed to maintain the fifteen-minute face-to-face suicide checks required by County policy.  Vera also failed to observe the video monitors for a period of at least twenty minutes while she was preparing lunch for the inmates—a period of time during which Lacy was exhibiting obvious suicidal behavior.  Had two jailers been on duty that morning, it is likely that a jail official would have noticed Lacy's suicidal behavior and would have taken steps to protect Lacy from self-inflicted harm.

Vera never called Sheriff Evans to inform him that she could not perform all of the required suicide checks and she never called the jail administrator or other jail staffers to ask for

assistance.  Sheriff Evans never asked Vera if she needed help and never made efforts to call in

another jailer, despite full knowledge that Vera was the only jailer on duty that day and despite

the Sheriff's concern that Vera would be unable to complete all of her duties.  When pressed as

to whether this was an isolated incident or a frequent occurrence, Sheriff Evans admitted that in

the past two years there were several occasions where, due to understaffing, the jailer on duty

would have been unable to satisfy all of her job responsibilities:

> Q: Did you try to get anybody to come in to help Brenda, in regards to those duties?
>
> . . .
>
> A: No.
>
> Q: Why not?
>
> A: Well . . . that was just the same—that day was the same as the day before.
>
> Q: In what way?  That she . . . or whoever was on duty would . . . have more work than
> they could possibly do?  Is that a fair statement?
>
> A: Not always, but sometimes, yes.
>
> Q: And so the 19th of July, 2012, when you left for lunch and you knew that Brenda was
> going to have a tough time finishing all she had to do, plus do the cell checks, plus do the
> observation for the suicide, correct?
>
> A: Uh-huh.  Yes.
>
> Q: And that was pretty much like the other days for the month before and the year before
> and the year before that, correct?
>
> A: Yes.
>
> Evans Dep. 33:18-25, 34:1-14 (Pl.'s App. 145-46).

This summary judgment evidence is sufficient to create a genuine dispute of material fact as to whether Hansford County had an unwritten policy of understaffing and indifference to inmate supervision that was maintained with deliberate indifference and that was the moving force behind Vera's violation of Lacy's Fourteenth Amendment rights.  Sheriff Evans knew that the Hansford County jail was sometimes understaffed and that for a period of at least two years prior to July 19, 2012, jailers sometimes had trouble completing all of their duties as a result of this understaffing.  Given these facts, a reasonably jury could find that the County had an unwritten policy or practice of understaffing the jail.  A reasonable jury could also find that the County maintained this practice with deliberate indifference, because it was objectively obvious that the consequences of understaffing could include constitutional violations.  *See Piotrowski v. City of Hous.*, 237 F.3d 567, 579 (5th Cir. 2001).

Plaintiffs' summary judgment evidence creates genuine factual disputes about (1) whether Brenda Vera acted with deliberate indifference to the risk that Lacy would commit suicide; and (2) whether Vera's actions were the result of a Hansford County policy of understaffing that was maintained by Sheriff Evans with deliberate indifference to the likelihood of constitutional violations.  *See Olabisiomotosho v. City of Hous.*, 185 F.3d 521, 526 (5th Cir. 1999). Accordingly, Defendants' *Motion for Summary Judgment* is denied as to Plaintiffs' § 1983 claims against Hansford County.

## CONCLUSION

Defendants' *Motion for Summary Judgment* is GRANTED IN PART and DENIED IN PART, specifically:

- Defendants' *Motion for Summary Judgment* is DENIED as to Plaintiffs' 42 U.S.C. § 1983 claims against Defendant Hansford County.

- Defendants' *Motion for Summary Judgment* is GRANTED as to Plaintiffs' 42 U.S.C.

  § 1983 claims against Defendant Brenda Vera.

IT IS SO ORDERED.

Signed this the ___22nd___ day of May, 2015.


**MARY LOU ROBINSON**
**UNITED STATES DISTRICT JUDGE**

31